# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Marriage of | ) ) ) | No. 72562-9-I |
| SOLOMON M. MEKURIA, | ) ) | DIVISION ONE |
| Appellant/Cross-<br>Respondent, | ) ) ) ) | |
| and | ) ) | |
| ASTER MENFESU, | ) ) | UNPUBLISHED |
| Respondent/Cross-<br>Appellant. | ) ) ) ) | FILED: September 28, 2015 |

Cox, J. — Solomon Mekuria appeals from trial court orders modifying a parenting plan and order of child support. He contends the trial court abused its discretion in ordering him to pay his daughter's private school tuition, allocating sole decision-making authority for health care decisions to the mother, and changing the location for exchanging their daughter. He also claims the trial court should have imposed restrictions pursuant to RCW 26.09.191(3)(a) because the mother's visual impairment allegedly constituted "neglect or substantial nonperformance of parenting functions."

Aster Menfesu cross-appeals the trial court's orders allowing Mekuria to petition for a modification of educational decision-making authority without a showing of adequate cause. She also contends the court abused its discretion by giving Mekuria custody of their daughter's passport.

The trial court abused its discretion by prospectively permitting Mekuria to petition for modification of the parenting plan without a showing of adequate cause. Accordingly, we reverse and remand to the trial court with instructions to strike this provision. In all other respects, we affirm.

Mekuria and Menfesu were married in 2007. The parties have one daughter, E.M., who was born on April 23, 2008.

In 2002, Menfesu was diagnosed with multifocal chorioretinitis, an inflammatory eye disease resulting in significant vision impairment. In 2005, Menfesu left her job as a nursing assistant. Since 2006, Menfesu has received social security disability benefits for her condition.

In 2009, Menfesu petitioned for dissolution. The parties proceeded to trial on the dissolution in 2010. Menfesu testified regarding her medical condition and the limitations to her sight. The trial court entered a decree of dissolution and a final parenting plan. The parenting plan provided that E.M., then two years old, would reside four days per week with Menfesu and three days per week with Mekuria until she reached school age. Once E.M. started kindergarten, E.M. would reside with Menfesu except for every other weekend, when Mekuria would pick her up from school on Friday afternoon and return her to school on Monday morning. Any exchanges that did not take place at school were to occur at the Beacon Hill police station. The parenting plan provided that the parties had joint decision-making authority regarding E.M.'s non-emergency health care but that Menfesu had sole decision-making authority for E.M.'s education. Neither party appealed.

On March 5, 2013, Mekuria petitioned for a major modification of the parenting plan. Mekuria sought to become E.M.'s primary residential parent and to limit Menfesu's residential time to supervised visits on Saturday afternoon, claiming that E.M. had received minor cuts and injuries in Menfesu's care due to Menfesu's vision impairment. A superior court judge dismissed Mekuria's modification petition, finding there was not adequate cause to proceed with the modification because the trial court judge in the dissolution proceeding was "well aware of the vision impairment and after hearing all of the evidence decided that the mother was the appropriate person to have custody of the child." Mekuria appealed the dismissal.

This court affirmed in an unpublished opinion. This court decided that Mekuria had not established adequate cause because the mother's medical condition "was known to the trial court [in the dissolution proceeding] at the time it established the parenting plan" and "[t]here was no evidence of any worsening of the condition." There was no further review by the supreme court.

On April 4, 2013, Menfesu filed a petition for a minor modification of the parenting plan, commencing this proceeding. She sought changes to the provisions regarding health care decision-making and the exchange location. She also sought custody of E.M.'s passport. A superior court commissioner found adequate cause to modify the parenting plan.

3

In his trial brief, Mekuria objected to Menfesu holding E.M.'s passport. He claimed he would present evidence that "the mother can easily and permanently hide the child from me if she is ever permitted to go to Ethiopia."[1]

Trial on Menfesu's modification petition took place over five days. The court heard testimony from eight witnesses and admitted 18 exhibits. On July 11, 2014, the trial court entered a modified parenting plan and child support order. The parenting plan provided that Menfesu would have sole decision-making authority for both E.M.'s education and health care. The parenting plan changed the location of exchanges of E.M. from the police station to the Walmart store in Renton. The parenting plan gave Mekuria authority to obtain a passport for E.M. and provided that he would be the custodian of the passport. The parenting plan also specified that if Menfesu "proposes to travel out of the country she shall give the father 10 days notice so that he can provide her with the child's passport," which Menfesu would be required to return to Mekuria within five days of return to the United States.[2] The parenting plan also contained minor changes to the residential schedule that are not challenged by either of the parties. The parenting plan did not impose any restrictions under RCW 26.09.191.

The child support order provided that Menfesu would pay E.M.'s private school tuition expenses but that "[i]f [Menfesu] becomes ineligible for the tuition reduction that she currently receives, or if the tuition due increases by more than 25% this order shall be modified without the need for a showing of substantial

---

[1] Clerk's Papers at 88.
[2] Id. at 371-72.

change in circumstances to order [Mekuria] to pay his proportional share of the tuition."[3]

In a memorandum opinion, the trial court stated that "[E.M.] appears to be doing well in Kindergarten" but that it had "concerns regarding her future academic success given the testimony regarding the mother's ability to help the child with lessons given that she is legally blind."[4] The trial court stated that, due to this concern, "the father may petition the court to modify the decision making on educational issues without a showing of adequate cause any time after June 1, 2016."[5]

Mekuria moved for reconsideration, which the trial court granted by entering findings on the issue of private school tuition. Mekuria sought reconsideration of the trial court's findings, which the trial court denied.

Proceeding pro se, Mekuria appeals. Menfesu cross-appeals.

## STANDARD OF REVIEW

We review a trial court's decision to modify a parenting plan or an order of child support for an abuse of discretion.[6] "A trial court's decision will not be reversed on appeal unless the court exercised its discretion in an untenable or manifestly unreasonable way."[7]

---

[3] Id. at 392.
[4] Id. at 404.
[5] Id. at 406.
[6] In re Marriage of Zigler and Sidwell, 154 Wn. App. 803, 808, 226 P.3d 202 (2010) (parenting plan); McCausland v. McCausland, 159 Wn.2d 607, 615, 152 P.3d 1013 (2007) (child support order).
[7] In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993).

We review the trial court's findings of fact to determine whether substantial evidence supports the findings.[8] Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.[9] However, we do not review the trial court's credibility determinations, nor do we weigh conflicting evidence.[10] Unchallenged findings of fact are verities on appeal.[11]

## PRIVATE SCHOOL TUITION

Mekuria contends that the trial court abused its discretion in ordering him to pay a proportional share of E.M.'s private school tuition. A trial court may exercise its discretion to determine the necessity for and the reasonableness of all expenses in excess of the basic child support obligation, including private school tuition.[12] Once a trial court determines such expenses are reasonable and necessary, they "shall be shared by the parents in the same proportion as the basic child support obligation."[13]

At the time of the trial on Menfesu's modification petition, E.M. was attending kindergarten at St. Anthony's, a private school in Renton within walking distance of Menfesu's home. Menfesu testified that she paid E.M.'s tuition and received a discounted rate based on her income. Mekuria testified that he

---

[8] Sunnyside Valley Irrigation Dist. v. Dickie, 111 Wn. App. 209, 214, 43 P.3d 1277 (2002).

[9] Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

[10] In re Marriage of Rich, 80 Wn. App. 252, 259, 907 P.2d 1234 (1996).

[11] In re Marriage of Brewer, 137 Wn.2d 756, 766, 976 P.2d 102 (1999).

[12] RCW 26.19.080(4).

[13] RCW 26.19.080(3).

6

agreed with the decision to send E.M. to private school, though he preferred for her to attend a different private school that was closer to his home in Everett.

The trial court made the following findings regarding the reasonableness and necessity of private school tuition:

> [T]he parties should share in the private school tuition cost, based on the expressed desire of both parties that the child attend private school, the father's argument that public school would be detrimental to the child, the fact that the child has been attending private school for the past year, and that the father has sufficient income to contribute to the costs. The court further finds that given the mother's alleged limitations with reading and assisting [E.M.] with homework, it is in [E.M.'s] best interest to attend private school where the student to teacher ratio is smaller.[14]

Mekuria contends that "private school tuition cannot be ordered by a court without certain requisite factors, including a pattern of private school[ing] being used for a substantial period of time and that a change from that pattern would be detrimental to the child."[15] Mekuria also argues that a trial court is excluded from considering a parent's income or ability to pay. Mekuria is incorrect. In In re Marriage of Stern, cited by Mekuria, this court held that relevant factors presenting a legitimate reason for ordering payment of private school tuition include, but are not limited to, "family tradition, religion, and past attendance at a private school."[16] But this is a non-exclusive list and a trial court may consider

---

[14] Clerk's Papers at 523-24.
[15] Appellant's Amended Opening Brief at 6.
[16] 57 Wn. App. 707, 720, 789 P.2d 807 (1990).

additional factors in making its determination whether private school tuition is a reasonable and necessary expense.[17] The trial court must also consider a parent's ability to pay.[18]

Mekuria assigns error to the trial court's finding regarding his ability to pay. But substantial evidence in the record supported this finding. The child support worksheet record shows that Mekuria's monthly gross income was $7,547.73, as compared to Menfesu's monthly gross income of $1,410.00. Mekuria does not challenge this calculation. The trial court did not abuse its discretion in determining that Mekuria had the ability to pay a proportionate share of private school tuition. Though Mekuria contends that his economic circumstances have since changed, this evidence on which he now relies was not before the trial court. We consider only the evidence that was before the trial court at the time it made its decisions.[19]

Substantial evidence supported the trial court's finding regarding Mekuria's ability to pay. This finding, in conjunction with the remaining unchallenged findings, adequately support the trial court's order. The trial court did not abuse its discretion in ordering Mekuria to pay a proportional share of E.M.'s tuition should Menfesu cease to receive a tuition reduction or if the cost of tuition increases by more than 25 percent.

---

[17] State ex rel. J.V.G. v. Van Guilder, 137 Wn. App. 417, 428, 154 P.3d 243 (2007).
[18] Id. at 429-30.
[19] RAP 9.1; RAP 9.11.

## TRANSPORTATION

Mekuria argues that the trial court abused its discretion by changing the exchange location from the Beacon Hill police station to the Renton Walmart. He argues that this requires him "to do 100% of transportation for visitation purposes, meeting [Menfesu] near her home instead of a mid-point," and that the trial court should have allocated this responsibility more equally with Menfesu.[20]

Menfesu testified that it took 30 to 40 minutes to reach the police station on the bus from her house. Menfesu also testified that Mekuria was typically at least an hour late to the exchanges and she and E.M. once had to wait three hours for him to arrive. Menfesu testified that the police station was sometimes closed at the time of the exchange and she and E.M. would have to wait outside in the cold or rain. Menfesu testified that Walmart would be a more convenient location because it was a ten minute walk from her house, was open long hours, and had things to amuse E.M. while she waited.

Mekuria testified that he had no objection to changing the exchange location to Walmart. The trial court admitted copies of maps showing that the Walmart location resulted in only five additional minutes of travel time for Mekuria.

Substantial evidence in the record supported the trial court's order modifying the exchange location, including the fact that it was significantly easier

---

[20] Appellant's Amended Opening Brief at 1.

for Menfesu to reach and was open longer hours. Moreover, Mekuria expressly consented to the change. The trial court did not abuse its discretion.

## DECISION-MAKING

### *Health Care*

Mekuria contends that the trial court erred in allocating sole decision-making authority regarding E.M.'s health care to Menfesu. There was no abuse of discretion in this respect.

A parenting plan must allocate decision-making authority to one or both parents regarding the child's education, health care, and religious upbringing.[21] Pursuant to RCW 26.09.187(2), a trial court must order sole decision-making to one parent when it finds that (1) a limitation on the other parent's decision-making authority is mandated by RCW 26.09.191; (2) both parents are opposed to mutual decision-making; or (3) one parent is opposed to mutual decision-making and the opposition is reasonable based on the following criteria:

> (i) The existence of a limitation under RCW 26.09.191;
> (ii) The history of participation of each parent in decision making in each of the areas in RCW 26.09.184(5)(a);
> (iii) Whether the parents have a demonstrated ability and desire to cooperate with one another in decision making in each of the areas in RCW 26.09.184(5)(a); and
> (iv) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.[22]

Mekuria argues that a trial court may not restrict his right to participate in decision-making in the absence of express findings that a parent has engaged in conduct outlined in RCW 26.09.191. But that is only one of the factors a trial

---

[21] RCW 26.09.184(5)(a).
[22] RCW 26.09.187(2)(b), (c).

court must consider. The remaining facts support the trial court's order giving Menfesu sole decision-making authority regarding E.M.'s health care.

Menfesu testified that that she took E.M. to a clinic in Renton for her yearly well-child visits but that Mekuria did not tell her that he was simultaneously taking E.M. to a different clinic in Everett. Menfesu testified that when she learned this, she contacted the Everett clinic to get E.M.'s immunization records but that the clinic would only release them to Mekuria. As a result, E.M. received duplicate vaccinations at her five-year-old well-child visit. Menfesu also testified that she had difficulty obtaining E.M.'s medical and dental insurance cards from Mekuria. Finally, Menfesu testified that it would take her approximately three or four hours to take E.M. to well-child visits at the Everett clinic. Both the guardian ad litem and a social worker recommended that Menfesu be granted sole decision-making authority because of the parents' inability to communicate and cooperate regarding E.M.'s health care.

### Education

Menfesu cross-appeals the provision allowing Mekuria to petition for a modification of educational decision-making authority in 2016 without a showing of adequate cause. We agree with Menfesu that this was an abuse of discretion.

A court may "modify a parenting plan or custody decree pursuant only to RCW 26.09.260 and .270."[23] RCW 26.09.260(1) provides that a trial court may not modify a parenting plan unless it finds that (1) there has been a substantial

---

[23] In re the Parentage of C.M.F., 179 Wn.2d 411, 419, 314 P.3d 1109 (2013).

change of circumstances of either parent or of a child, and (2) the adjustment is in the best interest of the child. A "substantial change in circumstances" is a fact that is unknown to the trial court at the time it entered the original parenting plan or an unanticipated fact that arises after entry of the original plan.[24] RCW 26.09.270 requires a party seeking to modify a parenting plan to submit "an affidavit setting forth facts supporting the requested order or modification." The court "shall deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits."[25] "Adequate cause" means, at a minimum, evidence sufficient to support a finding on each fact that the moving party must prove in order to modify the parenting plan.[26] A court abuses its discretion if it fails to follow these procedures.[27]

The trial court abused its discretion by ruling that Mekuria may petition in the future to modify the educational decision-making provision in 2016 without a showing of adequate cause. This ruling disregards the mandatory provisions of controlling statutes. RCW 26.09.260 requires Mekuria to make a prima facie showing that there has been a substantial change in circumstances since the time of the original parenting plan and that the modification is in E.M.'s best interests. On this basis alone, the court abused its discretion.

---

[24] In re Marriage of Tomsovic, 118 Wn. App. 96, 105, 74 P.3d 692 (2003).
[25] RCW 26.09.270.
[26] In re Marriage of Lemke, 120 Wn. App. 536, 540, 85 P.3d 966 (2004).
[27] In re Parentage of M.F., 141 Wn. App. 558, 572, 170 P.3d 601 (2007).

Moreover, the basis of the court's decision is not within the range of acceptable choices that the proper exercise of discretion requires.[28] Specifically, the trial court appears to have speculated that both Menfesu's vision would further deteriorate and any such possible deterioration would negatively impact her ability to support E.M. academically. There is no evidence in this record supporting either factual premise. No evidence was presented regarding whether Menfesu's vision had changed since the 2010 dissolution trial. Moreover, the evidence showed that Menfesu was more than capable of ensuring E.M.'s educational needs were met. A family friend came over to Menfesu's house every Tuesday afternoon for approximately two hours to go over E.M.'s homework for the week and read any notes from the school. Menfesu's friend also read to E.M. and helped her with school projects. On Wednesdays, Thursdays and Fridays, Menfesu arranged for E.M. to attend a local afterschool homework assistance program. Menfesu also checked out audiobook versions of books E.M. was assigned at school so that they could listen to them together. E.M.'s teachers were aware of Menfesu's vision impairment and would give her information in verbal rather than written form. The principal of St. Anthony's testified that E.M. was doing "very well" in school and "exemplary" in some subjects.

---

[28] In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

13

We have held that a parent's disability "is not, in and of itself, proof that a parent is unfit or incapable."[29] As amicus curiae, the National Federation of the Blind notes, visually impaired parents throughout the country "successfully care for their children and provide them with educational support and guidance at all ages," and that for parents with disabilities, "[n]egative speculations about the future are common and often seem to be based on stereotypes rather than on evidence."[30] Applying these principles here, even if we assumed both that the mother's vision deteriorated further, there is absolutely no evidence here that would adversely impact her ability to parent successfully. We decline to speculate otherwise.

Finally, it is difficult to see how in the absence of the required showing that the mother's vision adversely impacted her ability to parent, a decision depriving her of decision-making authority would be in the best interest of the child. After all, that is the proper focus of the relevant inquiry a court must make under the circumstances of this case.

For these reasons, the court abused its discretion in this respect.

## RESTRICTIONS

Finally, Mekuria contends that the trial court erred by failing to impose restrictions against Menfesu pursuant to RCW 26.09.191(3)(a), which provides that "the court may preclude or limit any provisions of the parenting plan" in the

---

[29] In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005).

[30] Megan Kirshbaum, Daniel Taube and Rosalind Lasian Baer, Parents with Disabilities: Problems in Family Court Practice, 4 J. Ctr. for Families, Child. & Cts. 38 (2003).

event of "[a] parent's neglect or substantial nonperformance of parenting functions." Mekuria argues that Menfesu "neglected" her parental duties because she sought community assistance for help with E.M.'s homework instead of helping E.M. by herself. But RCW 26.09.191 limitations were not at issue in this modification proceeding, and Mekuria's previous attempt to modify the parenting plan on these grounds was denied.

## PASSPORT

Menfesu contends the trial court abused its discretion by giving Mekuria custody of E.M.'s passport. We hold that under the circumstances of this case that are currently before us, the trial court acted within its discretion.

The guardian ad litem recommended that Menfesu be authorized to obtain and hold E.M.'s passport, based on her opinion that "[i]t would be beneficial for [E.M.] to have provisions related to International travel to avoid conflicts in the future."[31] The guardian ad litem testified she had no basis to believe either parent would abscond with E.M. from the United States.

Mekuria, who appeared pro se, did not present evidence or testimony regarding the passport issue. During closing argument, Mekuria frequently addressed subjects that were not at issue in the proceeding. After redirecting Mekuria several times, the trial court proceeded to ask Mekuria questions regarding several subjects, including the exchange location, his employment, and E.M.'s health insurance. The trial court also prompted Mekuria to address his objections regarding the passport. Mekuria responded:

---

[31] Exhibit 1.

15

I was in the other room, overheard her talking about – she's coming to Ethiopia, going back to Ethiopia, and I think they asked her for some reason – "You don't drive a car, so" – and things like that – and she answered, "No, no, no, I can drive when I come back, when I am back in my country, but I cannot drive in this – in the US, I can drive in my country."

So now that – I remember that now – became clear – she wanted the passport. She wanted – she has the – this income from Social Security and probably child-support goes direct to her bank account, so she can secure all of this. She can go back home and – to take the child and I never see the child. That was my concern.[32]

When asked if he wanted E.M. to have a passport, Mekuria responded,

I would like to have that, yes – both of us control it – with the understanding – not 100%, like she stated on her statement, she wants to have control and she wants to travel whenever she wants to, things like that – I will object.[33]

The trial court gave Menfesu's attorney the opportunity to address any of the issues raised in her questioning of Mekuria. Menfesu's attorney did not address the passport issue.

Menfesu now argues that by making Mekuria the custodian of E.M.'s passport, the trial court improperly modified the parenting plan without complying with RCW 26.09.260. But Barton recommended that the trial court give one parent custody over E.M.'s passport "to avoid conflicts in the future." Furthermore, Mekuria testified that he overheard a telephone conversation in which Menfesu discussed "going back to Ethiopia." Based on this evidence, the trial court found there had been a substantial change of circumstances and the modification was in E.M.'s best interest. Though Menfesu challenges the

_____

[32] Report of Proceedings (April 7, 2014) at 570.
[33] Id. at 570-71.

16

credibility of Mekuria's testimony, we note that the trial court expressly found that Mekuria "testified credibly to a telephone conversation the mother had indicating her potential plan to move out of the country at some point."[34] A trial court's credibility determinations are not subject to review on appeal.

Relying on Katare v. Katare, Menfesu argues that, in order to restrict her ability to travel, it must make a finding that she was a flight risk.[35] But Katare is inapposite. In Katare, following evidence that the children's father had threatened to abscond with the children to India, the trial court imposed travel restrictions pursuant to RCW 26.09.191(3)(g).[36] The parenting plan prohibited the father from taking the children out of the country until they turned 18 and denied him access to their passports or birth certificates; the father was also required to surrender his own passport when the children visited with him.[37] Here, in contrast, nothing restricts Menfesu's right to travel internationally with E.M. The parenting plan makes Mekuria the custodian of E.M.'s passport. If Menfesu wishes to travel internationally with E.M., she must request the passport from Mekuria with at least 10 days' notice and must return it to him within five days of returning to the United States. Though Menfesu argues that giving Mekuria custody of E.M.'s passport will generate future conflict between the parties, we decline to speculate on what may happen in the future.

---

[34] Clerk's Papers at 407.
[35] Katare v. Katare, 175 Wn.2d 23, 283 P.3d 546 (2012).
[36] Id. at 33-34.
[37] Id. at 31.

Finally, Menfesu argues that she was denied due process because she was not provided with notice and an ability to cross-examine Mekuria's statement, which he made after the close of evidence. But Mekuria asserted in his trial brief that he would present evidence that Menfesu planned to take E.M. to Ethiopia. Furthermore, the trial court noted that it had elicited additional testimony from Mekuria after the close of evidence and offered Menfesu's attorney an opportunity to follow up. The trial court's consideration of Mekuria's statement did not violate Menfesu's due process rights.

## ATTORNEY FEES

Menfesu requests attorney fees on appeal under RCW 26.09.140. Mekuria opposes the request, claiming that he does not have the ability to pay. We exercise our discretion and award reasonable attorney fees and costs to Menfesu.

RCW 26.09.140 provides in relevant part as follows:

. . .

> Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs.
>
> The court may order that the attorneys' fees be paid directly to the attorney who may enforce the order in his or her name.

Determining whether a fee award is appropriate under this statute requires this court to consider the parties' relative ability to pay and the arguable merits of the issues raised on appeal.[38] Here, both parties have provided updated

---

[38] In re Marriage of Leslie, 90 Wn. App. 796, 807, 954 P.2d 330 (1998).

financial declarations, as required. Having considered the merits of this appeal as well as the financial resources data contained in the required filings, we conclude that it is undisputed that Menfesu has the required need. Although Mekuria contends he does not have the ability to pay, our review of his updated financial declaration shows that he does. Accordingly, Menfesu is entitled to an award of reasonable attorney fees and costs on appeal.

Northwest Justice Project, as the proper assignee of her right to fees and costs, is entitled under the statute to receive these amounts and to enforce the order in its own name. It is so ordered, subject to its compliance with RAP 18.1(d).

We affirm the modified parenting plan in all aspects except for the provision permitting Mekuria to seek to modify decision-making authority for E.M.'s education without a showing of adequate cause. We remand to the trial court with instructions to strike this provision. We award reasonable attorney fees and costs to Menfesu, subject to its compliance with RAP 18.1(d).

_Cox, J._

WE CONCUR:

_____          _Spearman, C.J._

19